[Cite as *State v. Marshall*, 2022-Ohio-4693.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, :

      Plaintiff-Appellee, : No. 20AP-402
                             (C.P.C. No. 17CR-6845)
v. :
                        (REGULAR CALENDAR)
Jeffery T. Marshall, :

                              :

      Defendant-Appellant. :

                              :

D E C I S I O N

Rendered on December 27, 2022

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Darren M. Burgess* for appellee. **Argued:** *Darren M. Burgess.*

**On brief:** *Lisa M. Tome* for appellant. **Argued:** *Lisa M. Tome.*

APPEAL from the Franklin County Court of Common Pleas

JAMISON, J.

{¶ 1} Appellant, Jeffery T. Marshall ("Marshall"), appeals from a conviction by jury trial in the Franklin County Court of Common Pleas. For the reasons that follow, the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded to the trial court for additional proceedings.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Marshall was alleged to be involved in a criminal enterprise engaged in drugs, prostitution, and the trafficking of women. The criminal enterprise was controlled by

Marshall and his brother, co-defendant Cottrell Marshall ("Cottrell").[1]  Marshall was in charge when Cottrell was away, including when he was incarcerated from August 2014 until January 2015.

{¶ 3}  The criminal enterprise engaged the women in prostitution in several hotels located in North Columbus through an obsolete classified advertising website known as Backpage.com ("Backpage").[2]  The ads contained pictures and a contact number, and described the available services.  A person responding to the ad would text or call the number, and a member of the criminal enterprise would arrange the "date."  Once the date was over, the money would be collected by the criminal enterprise.

{¶ 4}  The women were subject to violent treatment if they failed to comply with the criminal enterprise.  The women were dependent on drugs, and the criminal enterprise used drugs as a means of control over the women.  Once the women started buying drugs from the criminal enterprise, they became indebted for sums far above the value of any drugs purchased, and this debt was used as a threat.  Drugs could only be purchased from the criminal enterprise.

{¶ 5}  The group was the subject of an investigation conducted by law enforcement beginning in 2012 and continuing through 2015.  At trial, the state established that Marshall was a member of a criminal enterprise that prostituted women.  Co-defendant Sara Wilson recalled the time she first met Cottrell in late 2011 when she purchased drugs from him.  Sara had done Backpage ads before, and she suggested to Cottrell that they could do it again.  (Mar. 3, 2020 Tr. Vol. II at 474.)  Soon Sara and other women began prostituting through the Backpage ads, and Cottrell formed a criminal enterprise and served as their pimp.  Prepaid Visa cards were used to pay for the ads, and Cottrell "would give us the money to go get them."  (Tr. at 478.)  Sara was a member of the criminal enterprise and had a tattoo of Cottrell's signature on her hip.

{¶ 6}  The Backpage dates were not innocent romantic meetings.  Sara testified that:

> A date is a call with a john. A john is a guy that is going to call
> the number that's posted on your ad and he's going to see if

---

[1] Co-defendants, Michelle Martin, Sara Wilson, Deshawn "Change" Givens, and Thorsa "Thor" Cartharn were members of the criminal enterprise. Marshall also went by the nickname, "Black" and Cottrell went by the nickname, "C.J."

[2] Backpage was a popular site for prostitutes to advertise adult services and was shut down by federal law enforcement agencies for human trafficking allegations in 2018.

you're available for a certain time and then they pay for the hour or the half an hour with you, and in - - in all - - it's - - the purpose is mainly to just have sex or - - or whatever that other person prefers. More than likely it's sex.

(Tr. at 467.)

The money went to the enterprise.

**{¶ 7}** Sara recalled that Cottrell would physically strike the women when they got out of line, and that she was intimidated by him. "[T]here was many a times I got my ass beat from him. It wasn't like it wasn't possible or wasn't going to happen. I had broken ribs and there was one time he beat me with a broomstick until it broke." (Tr. at 486.) Sara also saw Cottrell hit R.C. Sara was aware that Cottrell carried a gun.

**{¶ 8}** Sara met Marshall shortly after he was released from prison when "C.J. came by to get me and he had Black with him." (Tr. at 500.) When asked did anything happen with Marshall that day, Sara recalled that she was "secretly texting someone on my phone and my phone had went off and they wanted to see who it was and I wouldn't show them. So, like, he reached in the back to grab the cell phone from me, like twisting my arm to get the cell phone." *Id.*

**{¶ 9}** Sara was not free to leave. She testified that "there was no getting away from C.J." (Tr. at 531.) "One time I went to Mount Vernon and I thought that was the day I was going to die when he found me." (Tr. at 532.) Sara recalled when Cottrell found her at a man's house. She testified that "[h]e's got this look in his eyes. You - - you've broken your trust, so now you have to pay the price." (Tr. at 551.)

**{¶ 10}** J.W., one of Sara's johns, testified that he met Sara on the Backpage website, and they became friends. J.W. was also acquainted with R.C., and knew they were prostituting for the criminal enterprise. J.W. recalled Cottrell showed up at his house looking for R.C., banging and kicking on his door "to the point where I had to call the police and they showed up and asked him to leave." (Tr. at 563.)

**{¶ 11}** M.W. was a prostitute who worked for the criminal enterprise, and recalled that she was introduced to Cottrell as a pimp who could take care of her. However, she testified that at their first meeting, he forced her to have sex in a bathroom. (Mar. 4, 2020 Tr. Vol. III at 613.)

{¶ 12} M.W. testified that she had a cell phone, but the criminal enterprise "controlled my phone almost immediately * * * I had no way of contacting anybody." (Tr. at 614.) M.W. testified that the criminal enterprise posted ads on Backpage without her knowledge, and then communicated with the johns. M.W. recalled Michelle Martin, Cottrell's girlfriend, would have conversations on the cell phones with the johns, "pretending to be whoever, whatever ad they called about." (Tr. at 655.)

{¶ 13} M.W. had an identification card and was able to rent rooms in her name, but the criminal enterprise paid for all of the rooms where the dates occurred. After a date was set up, someone would come and tell you and we would prepare. M.W. testified that:

> When we stayed at the ExtendASuites, there was four of us in one bed, four females in one room. And so when another had a date - - I think that might have been even, like, the first night that [I.G.] got there. When one of us would have a date, the rest of us would have to go hide in the bathtub in the shower with the door shut so that they could keep an eye on us and make sure that we didn't go anywhere, but also make sure that everything was going okay in the, I guess, bed.

 (Tr. at 620-21.)

{¶ 14} M.W. recalled that after dates, the criminal enterprise would collect the money and she did not get to keep any of it. M.W. "feared what would happen" if she didn't give the criminal enterprise all of the money. (Tr. at 640.) No one felt free to leave. "There was somebody with us all the time." (Tr. at 645.)

{¶ 15} M.W. testified that she feared Marshall because "[h]e flew off the handle very easily and he is very intimidating. He was more so intimidating than C.J. or Change was." (Tr. at 634.) M.W. recalled that she first met Marshall at the Crowne Plaza hotel and "he smacked [T.D.] multiple times, multiple times and made us all watch." (Tr. at 633.) Marshall would be in the hotel room with the women. (Tr. at 744.)

{¶ 16} M.W. testified that Cottrell would only leave the premises if Marshall was around. (Tr. at 634-35.) M.W. described the hierarchy of the criminal enterprise and testified that "[i]t appeared more as if C.J. and Black worked together, maybe not so much a superior kind of thing. It seemed like they were equals." (Tr. at 635.)

{¶ 17} M.W. recalled the enterprise controlled her life. The enterprise forced the women to work with threats of violence and by holding large amounts of debt over their

heads.  The hotel room was like a jail cell.  A member of the enterprise "would sit in front of the door in a chair and always had a gun on his lap like trying - - I guess trying to intimidate us." (Tr. at 623.)  According to M.W., threats were "pretty normal." (Tr. at 630.)

{¶ 18} M.W. testified that the criminal enterprise also used drugs to control the women.  "That was, like, another form of mental, like, mind games also.  Like, it might be in the morning.  He might give you enough to get well, like a little piece just to get you well.  He might come later.  You know, you never really knew because it - - you were at his disposal." (Tr. at 642.)  M.W. and the other women were not allowed to buy drugs from anybody else. *Id.*  The criminal enterprise kept the women in deep debt regarding the drugs.  "None of it ever added up or made sense, but you weren't allowed to question it." (Tr. at 643.)

{¶ 19} M.W. recalled she finally got enough nerve to escape, and one night she ran away from the hotel.  M.W. was in the room preparing to see a john, and Marshall and others were hiding in the bathroom.  When M.W. opened the door for the john, she "took off running." (Tr. at 658.)  M.W. testified, "I was running and I remember seeing Change and I ran from him and by the time I got to Sinclair Road, he tackled me and * * * I was hit with a handgun on the side of my head." (Tr. at 648.)  The pair were wrestling in the middle of a busy street causing traffic to stop, and Change retreated into the hotel.  M.W. went to another hotel across the street and called the police.

{¶ 20} Co-defendant, Michelle Martin, testified that she was in a relationship with Cottrell when he informed her he was "sponsoring girls," which she knew to be "pimping them," and she joined him in the criminal enterprise.  (Mar. 5, 2020 Tr. Vol. IV at 846.)  Michelle normally booked two hotel rooms, "[b]ecause me and C.J. would have one and the girls would have one." (Tr. at 853.)  The rooms were paid for with prepaid credit cards purchased by the criminal enterprise. (Tr. at 860.)  The women normally did in-call dates in the hotel rooms, but occasionally did out-calls where they went to the john's location, driven and escorted by a member of the criminal enterprise.

{¶ 21} Michelle testified that she helped the women post ads on Backpage and that the criminal enterprise controlled the posts based on which prostitutes could make the most money. (Tr. at 864.)  If a john texts in response to an ad, Michelle will text them back, and would answer the phone if they called. *Id.*  She would write down the information from

the call or text, and then go to the women's room and give the women the information about the date. (Tr. at 865.)

{¶ 22} Michelle viewed Marshall's role as a leader. Michelle testified that Marshall would babysit the women, take their money, and could be intimidating "[i]f he had to." (Tr. at 1012.) "Usually when he was in town, he would kind of take over for C.J. so C.J. could go off and do whatever he wanted." (Tr. at 879.) "He would usually take over." (Tr. at 1012.) Michelle testified that Marshall "would kill for his brother." (Tr. at 880.)

{¶ 23} T.C. was another woman under the control of the criminal enterprise. T.C. testified that the criminal enterprise would give her money to purchase prepaid credit cards so she could post ads on Backpage and tell her what to post. (Tr. at 1039-40.)

{¶ 24} T.C. testified that after a date she would give all of the money to the criminal enterprise, including "Black." (Tr. at 1045.) "I know I've made over $1,000 easily and I had -- had nothing to show for it." (Tr. at 1047.) When asked how many dates she did in a day, T.C. testified "I mean, it never stopped. You have to kind of under- -- it wasn't like the beginning of a day and the end of a day. It didn't stop. Like, we didn't sleep. We didn't stop. So it was just always." (Tr. at 1046.) T.C. testified that the women could not sleep, and that Cottrell "would take the room key and smack them in the face with it" if he caught them sleeping. (Tr. at 1064.) The women were not allowed to sleep because they "[g]ot to work." (Tr. at 1065.)

{¶ 25} T.C. testified to the relationship between drugs and dates. "I would do dates. I would get money. Sometimes I would wait until I had a couple dates and then I would go to the other room where C.J. was. I would give him my money and I would get my drugs. I would go back to the other room and do more drugs to prepare myself for another date." (Tr. at 1048.) The endless cycle forced the prostitutes to become dependent on drugs and to the criminal enterprise.

{¶ 26} T.C. recalled the debt situation as "C.J. math," where "[y]ou always owed money. You never were even. You never even broke even. You always owed money." (Tr. at 1048-49.) T.C. testified that she saw Cottrell strangle a girl because she did not give him all her money.

{¶ 27} T.C. recalled that Marshall arrived in the later stages but asserted himself quickly. T.C. testified that she did not feel like she could leave when Marshall was around

and that he carried a gun.  T.C. testified that one of Marshall's roles was to "watch the girls." (Tr. at 1056.)

**{¶ 28}** T.C. was also at the hotel the night M.W. ran away.  She testified that:

> There were several of us at that America's Best and there were probably five girls and Black and Change, and [T.D.] and [M.W.] were going to do a double, which is two girls and one guy. And so we all went into the bathroom to hide while they did the date and I guess [M.W.] made the whole thing up so she could get away. I was in the bathroom and then I heard Change yelling she'd took off, she'd took off, and he went out after her and got her phone and tried to stop her, but she was - - it was freezing cold outside, but she was able to get away.

(Tr. at 1055.)

**{¶ 29}** Columbus Police Detective, Christopher Boyle, testified that in the fall of 2013 a newly formed Human Trafficking Task Force ("Task Force") was investigating activity at hotels in North Columbus.  Detective Boyle recalled that people could post ads for prostitution on Backpage using their phones, and the Task Force began to conduct undercover stings on the women in the ads.  Detective Boyle testified that "early on it became clear that there was a small group of individuals who were controlling all - - the majority - - vast majority of the prostitution activities and drug sales in that area that - - you know, it was organized in one way or another." (Mar. 6, 2020 Tr. Vol. V at 1246.)  The Task Force was assisted by patrol officers, who would pass along information regarding suspected human trafficking or prostitution in the area.  The Task Force also interviewed the johns to corroborate and "help us with more identifications of suspects we already knew." (Tr. at 1272.)

**{¶ 30}** Detective Boyle testified that the Task Force reviewed hotel records and identified a record of a four-day stay at the America's Best Value Inn in North Columbus beginning February 14, 2015, under the name of Jeffery Marshall.  (Tr. at 1267.)  Other records detailed hotel stays under other members of the criminal enterprise including some of the women.  Detective Boyle also referred to the Backpage ads and supporting documentation that ties the activity to the criminal enterprise.  He reviewed thousands of Backpage ads, and testified he saw ads from T.C., T.D., and M.W.  (Tr. at 1320-23.)  Cottrell's home was searched and phones, prepaid credit cards, cash, narcotics, and several firearms were recovered.

{¶ 31} As a result of the investigation, members of the criminal enterprise were charged in an 18-count indictment alleging sex trafficking and organized prostitution from 2012 to 2015.  Marshall was indicted for one count of engaging in a pattern of corrupt activity, R.C. 2923.32, F1, three counts of trafficking in persons, R.C. 2905.32, F1, three counts of compelling prostitution, R.C. 2907.21, F3, and three counts of promoting prostitution, R.C. 2907.22, F4.

{¶ 32} Marshall and his brother were jointly tried, and Marshall was convicted of one count of engaging in a pattern of corrupt activity, three counts of trafficking in persons, one count of compelling prostitution, and three counts of promoting prostitution.  He was sentenced to a mandatory ten-year sentence on each count of trafficking in persons, to be served consecutively, five years for engaging in a pattern of corrupt activity and one year each for promoting and compelling prostitution, to be served concurrently with each other and to the ten-year terms, for a total of 30-years.

{¶ 33} Marshall now brings this appeal.

## II.  ASSIGNMENTS OF ERROR

{¶ 34} Appellant assigns the following as trial court error:

> [1.] Appellant's convictions were without sufficient evidence, in violation of his right to due process under the United States and Ohio Constitutions.

> [2.] Appellant's convictions were against the manifest weight of the evidence in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

> [3.] The convictions on counts six and thirteen, trafficking in persons, must be reversed as the jury returned inconsistent verdicts by finding appellant not guilty of compelling prostitution.

> [4.] Appellant was deprived of a fair trial due to prosecutorial misconduct in violation of his right to due process as guaranteed by the Fifth and Fourteenth Amendment's to the United States Constitution.

> [5.] The trial court erred in failing to merge appellant's trafficking in persons convictions with the compelling

prostitution convictions and the promoting prostitution convictions in violation of the double jeopardy clause of the Fifth Amendment to the United States Constitution.

## III. STANDARD OF REVIEW

{¶ 35}  A sufficiency of the evidence challenge examines "whether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15.  The test for sufficiency is whether the prosecution has met its burden of production at trial, and is a question of law, not fact.  *State v. Boles*, 12th Dist. No. CA2012-06-012, 2013-Ohio-5202, ¶ 34.  An appellate court's standard of review for sufficiency of the evidence is whether any reasonable trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime proven beyond a reasonable doubt.  *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 12, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 36}  While sufficiency of the evidence tests whether the evidence is legally sufficient to support the conviction, the manifest weight of evidence standard "addresses the evidence's effect of inducing belief."  *State v. Haas*, 10th Dist. No. 10AP-35, 2011-Ohio-2676, ¶ 16.  A challenge to the weight of the evidence questions whether a greater amount of credible evidence was admitted to support the conviction than acquittal.  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25.  When weighing the evidence, the court of appeals must consider whether the evidence in a case is conflicting or where reasonable minds might differ as to the inferences to be drawn from it, consider the weight of the evidence, and consider the credibility of the witnesses to determine if "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 20, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1983).  The discretionary power to grant a new trial should be exercised only in the exceptional case where the evidence weighs heavily against the conviction.  *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114, (12th Dist.).

{¶ 37} In a review of alleged inconsistent verdicts, "an appellate court is not permitted to speculate about the reason for the inconsistency when it determines the validity of a verdict."  *State v. Peterson*, 10th Dist. No. 09AP-34, 2009-Ohio-5088, ¶ 14.

However, the defense did not raise an objection at sentencing when the trial court announced its verdicts. Therefore, Marshall has waived all but plain error. Crim.R. 52(B). Likewise, Marshall did not object to the prosecutor's comments at trial, so the appellate standard of review is also limited to plain error. *State v. White*, 82 Ohio St.3d 16 (1998). Plain error is apparent only if the outcome of the trial would have been different, but for the error. *State v. Long,* 53 Ohio St.2d 91 (1978).

{¶ 38} This court notes that Marshall did not object to the prosecutor's statement during closing arguments. Alleged error that was not objected to will not be reviewed by an appellate court unless plain error is shown. CrimR. 52(B). Plain error "must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection." *State v. Gullick*, 10th Dist. No. 13AP-26, 2013-Ohio-3342, ¶ 3. The error must be prejudicial and affect the outcome of the trial to be plain error. *State v. Perry*, 10th Dist. No. 01AP-996, 2004-Ohio-5152, ¶ 12.

{¶ 39} The appellate court applies a de novo standard of review in reviewing a trial court's merger determination. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699. When the de novo standard of review is applied, the appellate court "gives no deference to the trial court's legal determinations." *State v. Hamilton*, 9th Dist. No. 17CA011238, 2019-Ohio-1829, ¶ 17, quoting *State v. West*, 9th Dist. No. 04CA008554, 2005-Ohio-990, ¶ 33.

## IV.  LEGAL ANALYSIS

{¶ 40} In his first assignment of error, appellant contends that there was insufficient evidence to support his convictions. A Crim.R. 29 motion challenges the sufficiency of the evidence. *State v. Isaac*, 5th Dist. No. 15CA87, 2017-Ohio-7139, ¶ 16. Whether evidence is legally sufficient to sustain a verdict is a question of law. When examining the sufficiency of the evidence, an appellate court must "determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Barron*, 12th Dist. No. CA2020-12-088, 2022-Ohio-102, ¶ 88. A sufficiency of the evidence argument disputes whether the state has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, (1997).

{¶ 41} The jury found Marshall guilty of engaging in a pattern of corrupt activity, a violation of R.C. 2923.32(A)(1), which provides, "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity." "Enterprise" is defined as including "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). "Corrupt activity" is defined as any of the criminal offenses listed in R.C. 2923.31(I). And finally, a "[p]attern of corrupt activity" means "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

{¶ 42} The offense is dependent upon a defendant committing two or more predicate offenses listed in R.C. 2923.31(I). However, the offense also requires a defendant to be "employed by, or associated with" an "enterprise" and to "conduct or participate in" an "enterprise through a pattern of corrupt activity." R.C. 2923.32(A)(1). "Such pattern must include both a relationship and continuous activity, as well as proof of the existence of an enterprise. Thus, the conduct required to commit a RICO violation is independent of the conduct required to commit [the underlying predicate offenses]." *State v. Dudas*, 11th Dist. No. 2008-L-109, 2009-Ohio-1001, ¶ 46. *See also State v. Moulton*, 8th Dist. No. 93726, 2010-Ohio-4484, ¶ 36; *State v. Caudill*, 3d Dist. No. 5-97-35, 1998 Ohio App. LEXIS 6018, *9 (Dec. 2, 1998). The intent of the offense is "to criminalize the pattern of criminal activity, not the underlying predicate acts." *State v. Thomas*, 3d Dist. No. 1-11-25, 2012-Ohio-5577, ¶ 61, quoting *State v. Dodson*, 12th Dist. No. CA2010-08-191, 2011-Ohio-6222, ¶ 68. *See also Dudas* at ¶ 47

{¶ 43} Marshall was convicted of trafficking in persons, a violation of R.C. 2905.32, which provides in pertinent part:

> (A) No person shall knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, or knowingly attempt to recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, another person if either of the following applies:

(1) The offender knows that the other person will be subjected to involuntary servitude or be compelled to engage in sexual activity for hire.

A violation of R.C. 2905.32 is identified as "corrupt activity" in R.C. 2923.31(I)(2)(a), to the extent the conduct is different than the conduct upon which a violation of R.C. 2907.21 or 2907.22 is based. Marshall was also convicted of compelling prostitution, a violation of R.C. 2907.21, which provides that "[n]o person shall knowingly * * * [c]ompel another to engage in sexual activity for hire." Finally, Marshall was convicted of promoting prostitution in violation of R.C. 2907.22, which provides that:

No person shall knowingly:

(1) Establish, maintain, operate, manage, supervise, control, or have an interest in a brothel or any other enterprise a purpose of which is to facilitate engagement in sexual activity for hire;

(2) Supervise, manage, or control the activities of a prostitute in engaging in sexual activity for hire;

(3) Transport another, or cause another to be transported, in order to facilitate the other person's engaging in sexual activity for hire;

(4) For the purpose of violating or facilitating a violation of this section, induce or procure another to engage in sexual activity for hire.

A violation of R.C. 2907.21 or 2907.22 is "corrupt activity" pursuant to R.C 2923.31(I)(2)(c) when the proceeds of the activity exceed one thousand dollars, individually or by any combination of the violations. The three offenses are defined as "corrupt activity" in R.C. 2923.31(I).

{¶ 44} To sustain a conviction under R.C. 2923.32, it must be proven that Marshall associated with an enterprise that participated in two or more corrupt acts, specifically the crimes of compelling prostitution, promoting prostitution, and trafficking in persons.[3]

{¶ 45} The jury heard testimony from several women involved in the prostitution ring. Sara testified that she was forced to prostitute for the criminal enterprise and first met Marshall at a hotel with the criminal enterprise. M.W. testified that she did Backpage dates for the criminal enterprise and that it appeared Marshall and Cottrell worked together

---

[3] A conviction for compelling prostitution, R.C. 2907.21, and promoting prostitution, R.C. 2907.22, must be based on different conduct than the conviction for trafficking in persons, R.C. 2905.32.

as the leaders. M.W. recalled that the criminal enterprise was posting ads and she performed sex acts for money in hotel rooms rented by the enterprise. M.W.'s testimony established that Marshall used violence, intimidation, and force to control the women.

{¶ 46} Michelle Martin testified that Marshall was a leader of the criminal enterprise and would take over when Cottrell would leave. T.C. testified that she worked as a prostitute for the criminal enterprise for two years and that she was forced to relentlessly perform dates and was not allowed to sleep. T.C. gave Marshall money from her dates and was scared of him. R.C. testified that she was engaged in prostitution for the criminal enterprise, and they paid for her Backpage ads and hotel rooms. R.C. would hand over the money from the dates because she would get beat up if she refused.

{¶ 47} Detective Boyle produced a receipt of a hotel stay in the target area in Jeffery Marshall's name. M.W. testified several women were forced to stay in a single room and had to hide in the bathroom while another woman had a "date" in the room. Marshall would be in the hotel room with the women and they could not leave.

{¶ 48} Viewing the evidence and all reasonable inferences in favor of the prosecution, the proof presented at trial is more than sufficient to support Marshall's convictions. Marshall is associated with the criminal enterprise through his participation in its affairs and is characterized as a leader. He was often at hotels with the women and was actively involved in collecting money. In addition, the testimony established a pattern of trafficking in persons, compelling prostitution and promoting prostitution. All the testimony was more than sufficient to support Marshall's convictions and he has failed to demonstrate that the jury lost its way and created a manifest miscarriage of justice demanding reversal. Marshall's conduct in engaging in a pattern of corrupt activity supports his conviction for that charge. Marshall's first assignment of error is overruled.

{¶ 49} Marshall asserts that his conviction is against the manifest weight of the evidence in his second assignment of error. In contrast to a sufficiency argument, "a manifest weight challenge questions whether the prosecution has met its burden of persuasion." *State v. Bowden*, 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 13. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered." *Thompkins* at 387, superseded by constitutional amendment on other grounds, quoting *Martin* at 175. A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 50} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bentz*, 3d Dist. No. 1-16-17, 2017-Ohio-5483, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Wilson* at ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 51} Marshall argues that his conviction is against the manifest weight because there was very little testimony regarding his participation in the criminal enterprise, as opposed to the extensive testimony regarding Cottrell. However, the jury heard the testimony, and soundly rejected his proffered reasoning. The jury was able to digest the testimony and chose to convict Marshall.

{¶ 52} Marshall's conduct was clearly focused on advancing human trafficking and prostitution activities. The criminal enterprise compelled the women to engage in sexual activity by placing advertising on Backpage and arranging dates with the men who responded. Drugs, sleep deprivation, financial extortion, intimidation, and violence were all used to force the women to prostitute. The women were forced to live and work in crowded hotel rooms. All money from the dates were given directly to the criminal enterprise under duress. Non-compliance was met with violence. The women were constantly guarded, even while hiding in the bathroom while dates took place in the room.

{¶ 53} Even if Marshall's participation was, as he suggests, minimal and of a short duration, he nonetheless played a key role in the criminal enterprise. His actions forced the women to prostitute themselves.

{¶ 54} Taking all of the evidence into account, we cannot say that the jury lost its way in convicting Marshall and his convictions are not against the manifest weight of the

evidence. *Columbus v. Robbins*, 61 Ohio App.3d 324, 329 (10th Dist.1989). Accordingly, this determination is dispositive of the assignment of error. Marshall's second assignment of error is overruled.

{¶ 55} Marshall states as his third assignment of error that a finding of guilt in a trafficking charge is inconsistent with a finding of not guilty in a compelling prostitution charge and therefore deprives him of due process rights.

{¶ 56} Marshall argues that a finding of guilt of human trafficking requires evidence of compelling prostitution. However, "an acquittal on a predicate offense in the context of compound offenses does not mandate reversal on the compound offense." *State v. Bradley*, 8th Dist. No. 109547, 2021-Ohio-2687, ¶ 23. The trafficking in persons statute contains express language allowing the prosecution of both offenses:

> A prosecution for a violation of this section does not preclude a prosecution of a violation of any other section of the Revised Code. One or more acts, a series of acts, or a course of behavior that can be prosecuted under this section or any other section of the Revised Code may be prosecuted under this section, the other section of the Revised Code, or both sections.

R.C. 2905.32(D).

Compelling prostitution and promoting prostitution may be allied offenses with trafficking in persons, but they constitute separate crimes.

{¶ 57} The apparent inconsistency in convicting Marshall upon one count and acquitting him upon another, for the same conduct, does not create a fatally inconsistent verdict. Each count in a multi-count indictment is a distinct and independent matter and different verdicts on different counts do not justify overturning a jury conviction. *State v. Cardona*, 10th Dist. No. 10AP-1052, 2011-Ohio-4105, ¶ 15. Inconsistent responses to different counts do not create an inconsistency in the verdicts. *State v. Hicks*, 43 Ohio St.3d 72, 78 (1989).

{¶ 58} "When the defendant receives the benefit of an acquittal on one count, it is not unjust to require the defendant to accept the jury's conviction on the second related count." *State v. Jones*, 8th Dist. No. 96901, 2012-Ohio-920, ¶ 9, citing *U.S. v. Powell*, 469 U.S. 57, 65 (1984). The instant case does not present inconsistent responses to the same count.

{¶ 59} Further, the inconsistent verdicts do not violate due process. This court has "recognized that the rendering of dissimilar verdicts based purportedly on the same or similar evidence" is not a due process violation. *State v. D.D.F.*, 10th Dist. No. 13AP-688, 2014-Ohio-2075, ¶ 18. Inconsistency can indicate confusion or doubt just as easily as it can reflect compromise or mercy. *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, ¶ 16.

{¶ 60} We decline to vacate appellant's trafficking in persons convictions simply because the jury acquitted him of compelling prostitution. *State v. Carson*, 5th Dist. No. 18-CA-25, 2018-Ohio-5305, ¶ 47. A defendant can "be found guilty of one offense, but not guilty of the other." *State v. Wasil*, 9th Dist. No. 18AP0001, 2018-Ohio-4463, ¶ 6. A jury has no obligation to be consistent with verdicts on multiple counts and "a verdict will not be set aside merely because the findings necessary to support the conviction are inconsistent with the findings necessary to acquit the defendant of another charge." *State v. Shaffer*, 4th Dist. No. 18CA5, 2018-Ohio-4976, ¶ 8, quoting *State v. Reine,* 4th Dist. No. 06CA3102, 2007-Ohio-7221, ¶ 68. The convictions must stand and "not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy*, 79 Ohio St.3d 440, 444 (1997). The verdicts are not impermissibly inconsistent, and Marshall's third assignment of error is overruled.

{¶ 61} In his fourth assignment of error, Marshall claims that he was deprived of a fair trial because of prosecutorial misconduct. Marshall alleges the state engaged in misconduct when the prosecuting attorney compared the criminal conduct to slavery in closing argument.

{¶ 62} Under the plain error standard, we must determine whether the comments and questions by the prosecution were improper, and, if so, whether they prejudiced appellant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 92, citing *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). A trial is not "unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found

the defendant guilty even without the improper comments." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 121.

{¶ 63} The prosecutor stated:

> Now, slavery was outlawed in this country over 150 years ago and when that happened the former slaves didn't get to be doctors or teachers immediately. Some of them continued to work in their same jobs, but the difference was that they got paid for it. They got to keep the money.
>
> Human trafficking is slavery in the modern time because for these women they didn't get to choose what they did; and when they got out of that from C.J., some of them still prostituted because that was what they knew, but the difference was that at that point when they weren't with C.J., when they weren't with Black they got to choose what they did.

(Mar. 6, 2020 Tr. Vol. V at 1488.)

{¶ 64} Marshall contends that the statements contained inflammatory language designed to impermissibly appeal to jury's emotions. The comments, however, must be viewed in the context of the entire argument. "[I]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Whiteside*, 10th Dist. No. 08AP-602, 2009-Ohio-1893, ¶ 82. A prosecutor is allowed to make reasonable inferences about evidence presented at trial and comment on the inferences in closing arguments. *Treesh* at 466.

{¶ 65} The modern definition of slavery includes "submissiveness to a dominating influence." Merriam-Webster Unabridged Dict. (2020). Trafficking in persons, human trafficking, and modern slavery are used as umbrella terms to refer to both sex trafficking and compelled labor. "At the heart of this phenomenon is the traffickers' aim to exploit and enslave their victims and the myriad coercive and deceptive practices they use to do so." U.S. Dept. of State, Office to Monitor and Combat Trafficking in Persons web article, *What is Modern Slavery,* state.gov/what-is-modern-slavery/ (accessed May 9, 2022).

{¶ 66} Marshall's argument fails on the merits because the comments, viewed in context of the whole argument, do not rise to the level of misconduct. The prosecutor was referring to a common understanding that human trafficking is akin to modern slavery. Marshall has not demonstrated a reasonable probability that the jury interpreted the prosecutor's comments in an erroneous manner, such as pre-civil war slavery, resulting in

prejudice. The prosecutor made a direct comparison, and did not label any person a slave or slave master. However, even if the comments were found to be improper, as discussed above, there is sufficient evidence of guilt and it is clear beyond a reasonable doubt that a jury would have found Marshall guilty.

{¶ 67} We have reviewed the prosecutor's comments in the context of the entire trial, and cannot find that the result of the trial would be different. Therefore, the comments did not rise to plain error. Because we find no instances of prosecutorial misconduct, we overrule Marshall's fourth assignment of error.

{¶ 68} In his fifth assignment of error, Marshall contends and the state concedes, that the trial court erred in failing to merge the convictions for trafficking in persons, promoting prostitution, and compelling prostitution. This court agrees.

{¶ 69} Counsel for a co-defendant specifically addressed the merger in issue at sentencing, and Marshall's counsel adopted the arguments, so the objection was first raised in the trial court.

{¶ 70} The allied offenses statute, R.C. 2941.25, generally prohibits multiple punishments for the same conduct, but the trafficking in persons statute, R.C. 2905.32, expressly states that if a defendant is convicted of that statute "and also is convicted of or pleads guilty to a violation of Section 2907.21 of the Revised Code based on the same conduct involving the same victim that was the basis of the violation of this section * * * the two offenses are allied offenses of similar import under Section 2941.25 of the Revised Code." R.C. 2905.32(D). The convictions are based on the same victims and the same conduct. Appellee concedes the same.

{¶ 71} Marshall was improperly convicted for multiple offenses based on the same conduct. Therefore, the "trial court must merge the crimes into a single conviction and impose a sentence that is appropriate for the offense chosen for sentencing." *State v. Damron*, 129 Ohio St.3d 86, 2011-Ohio-2268, ¶ 17. We sustain Marshall's fifth assignment of error.

## V. CONCLUSION

{¶ 72} Marshall's first, second, third, and fourth assignments of error are overruled. Having sustained Marshall's fifth assignment of error, we reverse his sentence and remand with instructions to resentence in accordance with R.C. 2905.32(D).

*Judgment affirmed in part, reversed in part; and
case remanded with instructions.*

SADLER and BEATTY BLUNT, JJ., concur.

_____