[Cite as *State v. Marshall*, 2024-Ohio-5335.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, :

   Plaintiff-Appellee, :    No. 23AP-610
               (C.P.C. No. 17CR-6845)

v. :

                (REGULAR CALENDAR)
Jeffery T. Marshall, :

   Defendant-Appellant. :

_____

D E C I S I O N

Rendered on November 7, 2024

_____

**On brief:** *G. Gary Tyack,* Prosecuting Attorney, and *Darren M. Burgess*, for appellee.[1]

**On brief:** *Lisa M. Tome*, for appellee.

_____

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} Defendant-appellant, Jeffery T. Marshall, appeals from a September 6, 2023 judgment entry sentencing him to an aggregate term of 30 years in prison. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This court set out the relevant facts and procedural history of this case in *State v. Marshall*, 10th Dist. No. 20AP-402, 2022-Ohio-4693 ("*Marshall I*") as follows:

> Marshall was alleged to be involved in a criminal enterprise engaged in drugs, prostitution, and the trafficking of women. The criminal enterprise was controlled by Marshall and his brother, co-defendant Cottrell Marshall ("Cottrell").[] Marshall was in charge when Cottrell was away, including when he was incarcerated from August 2014 until January 2015.
>
> The criminal enterprise engaged the women in prostitution in several hotels located in North Columbus through an obsolete classified advertising website

_____

[1] On September 27, 2024, the parties filed a joint notice of waiver of oral argument.

known as Backpage.com ("Backpage").[] The ads contained pictures and a contact number, and described the available services. A person responding to the ad would text or call the number, and a member of the criminal enterprise would arrange the "date." Once the date was over, the money would be collected by the criminal enterprise.

The women were subject to violent treatment if they failed to comply with the criminal enterprise. The women were dependent on drugs, and the criminal enterprise used drugs as a means of control over the women. Once the women started buying drugs from the criminal enterprise, they became indebted for sums far above the value of any drugs purchased, and this debt was used as a threat. Drugs could only be purchased from the criminal enterprise.

The group was the subject of an investigation conducted by law enforcement beginning in 2012 and continuing through 2015. At trial, the state established that Marshall was a member of a criminal enterprise that prostituted women. Co-defendant Sara Wilson recalled the time she first met Cottrell in late 2011 when she purchased drugs from him. Sara had done Backpage ads before, and she suggested to Cottrell that they could do it again. (Mar. 3, 2020 Tr. Vol. II at 474.) Soon Sara and other women began prostituting through the Backpage ads, and Cottrell formed a criminal enterprise and served as their pimp. Prepaid Visa cards were used to pay for the ads, and Cottrell "would give us the money to go get them." (Tr. at 478.) Sara was a member of the criminal enterprise and had a tattoo of Cottrell's signature on her hip.

The Backpage dates were not innocent romantic meetings. Sara testified that:

> A date is a call with a john. A john is a guy that is going to call the number that's posted on your ad and he's going to see if you're available for a certain time and then they pay for the hour or the half an hour with you, and in - - in all - - it's - - the purpose is mainly to just have sex or - - or whatever that other person prefers. More than likely it's sex.

(Tr. at 467.)

The money went to the enterprise.

Sara recalled that Cottrell would physically strike the women when they got out of line, and that she was intimidated by him. "[T]here was many a times I got my ass beat from him. It wasn't like it wasn't possible or wasn't going to happen. I had broken ribs and there was one time he beat me with a broomstick until it broke." (Tr. at 486.) Sara also saw Cottrell hit R.C. Sara was aware that Cottrell carried a gun.

Sara met Marshall shortly after he was released from prison when "C.J. came by to get me and he had Black with him." (Tr. at 500.) When asked did anything happen with Marshall that day, Sara recalled that she was "secretly texting someone on my phone and my phone had went off and they wanted to see who it was and I wouldn't show them. So, like, he reached in the back

to grab the cell phone from me, like twisting my arm to get the cell phone." *Id.*

Sara was not free to leave. She testified that "there was no getting away from C.J." (Tr. at 531.) "One time I went to Mount Vernon and I thought that was the day I was going to die when he found me." (Tr. at 532.) Sara recalled when Cottrell found her at a man's house. She testified that "[h]e's got this look in his eyes. You - - you've broken your trust, so now you have to pay the price." (Tr. at 551.)

J.W., one of Sara's johns, testified that he met Sara on the Backpage website, and they became friends. J.W. was also acquainted with R.C., and knew they were prostituting for the criminal enterprise. J.W. recalled Cottrell showed up at his house looking for R.C., banging and kicking on his door "to the point where I had to call the police and they showed up and asked him to leave." (Tr. at 563.)

M.W. was a prostitute who worked for the criminal enterprise, and recalled that she was introduced to Cottrell as a pimp who could take care of her. However, she testified that at their first meeting, he forced her to have sex in a bathroom. (Mar. 4, 2020 Tr. Vol. III at 613.)

M.W. testified that she had a cell phone, but the criminal enterprise "controlled my phone almost immediately * * * I had no way of contacting anybody." (Tr. at 614.) M.W. testified that the criminal enterprise posted ads on Backpage without her knowledge, and then communicated with the johns. M.W. recalled Michelle Martin, Cottrell's girlfriend, would have conversations on the cell phones with the johns, "pretending to be whoever, whatever ad they called about." (Tr. at 655.)

M.W. had an identification card and was able to rent rooms in her name, but the criminal enterprise paid for all of the rooms where the dates occurred. After a date was set up, someone would come and tell you and we would prepare. M.W. testified that:

> When we stayed at the ExtendASuites, there was four of us in one bed, four females in one room. And so when another had a date - - I think that might have been even, like, the first night that [I.G.] got there. When one of us would have a date, the rest of us would have to go hide in the bathtub in the shower with the door shut so that they could keep an eye on us and make sure that we didn't go anywhere, but also make sure that everything was going okay in the, I guess, bed.

(Tr. at 620-21.)

M.W. recalled that after dates, the criminal enterprise would collect the money and she did not get to keep any of it. M.W. "feared what would happen" if she didn't give the criminal enterprise all of the money. (Tr. at

640.) No one felt free to leave. "There was somebody with us all the time." (Tr. at 645.)

M.W. testified that she feared Marshall because "[h]e flew off the handle very easily and he is very intimidating. He was more so intimidating than C.J. or Change was." (Tr. at 634.) M.W. recalled that she first met Marshall at the Crowne Plaza hotel and "he smacked [T.D.] multiple times, multiple times and made us all watch." (Tr. at 633.) Marshall would be in the hotel room with the women. (Tr. at 744.)

M.W. testified that Cottrell would only leave the premises if Marshall was around. (Tr. at 634-35.) M.W. described the hierarchy of the criminal enterprise and testified that "[i]t appeared more as if C.J. and Black worked together, maybe not so much a superior kind of thing. It seemed like they were equals." (Tr. at 635.)

M.W. recalled the enterprise controlled her life. The enterprise forced the women to work with threats of violence and by holding large amounts of debt over their heads. The hotel room was like a jail cell. A member of the enterprise "would sit in front of the door in a chair and always had a gun on his lap like trying - - I guess trying to intimidate us." (Tr. at 623.) According to M.W., threats were "pretty normal." (Tr. at 630.)

M.W. testified that the criminal enterprise also used drugs to control the women. "That was, like, another form of mental, like, mind games also. Like, it might be in the morning. He might give you enough to get well, like a little piece just to get you well. He might come later. You know, you never really knew because it - - you were at his disposal." (Tr. at 642.) M.W. and the other women were not allowed to buy drugs from anybody else. *Id.* The criminal enterprise kept the women in deep debt regarding the drugs. "None of it ever added up or made sense, but you weren't allowed to question it." (Tr. at 643.)

M.W. recalled she finally got enough nerve to escape, and one night she ran away from the hotel. M.W. was in the room preparing to see a john, and Marshall and others were hiding in the bathroom. When M.W. opened the door for the john, she "took off running." (Tr. at 658.) M.W. testified, "I was running and I remember seeing Change and I ran from him and by the time I got to Sinclair Road, he tackled me and * * * I was hit with a handgun on the side of my head." (Tr. at 648.) The pair were wrestling in the middle of a busy street causing traffic to stop, and Change retreated into the hotel. M.W. went to another hotel across the street and called the police.

Co-defendant, Michelle Martin, testified that she was in a relationship with Cottrell when he informed her he was "sponsoring girls," which she knew to be "pimping them," and she joined him in the criminal enterprise. (Mar. 5, 2020 Tr. Vol. IV at 846.) Michelle normally booked two hotel rooms, "[b]ecause me and C.J. would have one and the girls would have one." (Tr. at 853.) The rooms were paid for with prepaid credit cards purchased by the criminal enterprise. (Tr. at 860.) The women normally did in-call dates in the

hotel rooms, but occasionally did out-calls where they went to the john's location, driven and escorted by a member of the criminal enterprise.

Michelle testified that she helped the women post ads on Backpage and that the criminal enterprise controlled the posts based on which prostitutes could make the most money. (Tr. at 864.) If a john texts in response to an ad, Michelle will text them back, and would answer the phone if they called. *Id.* She would write down the information from the call or text, and then go to the women's room and give the women the information about the date. (Tr. at 865.)

Michelle viewed Marshall's role as a leader. Michelle testified that Marshall would babysit the women, take their money, and could be intimidating "[i]f he had to." (Tr. at 1012.) "Usually when he was in town, he would kind of take over for C.J. so C.J. could go off and do whatever he wanted." (Tr. at 879.) "He would usually take over." (Tr. at 1012.) Michelle testified that Marshall "would kill for his brother." (Tr. at 880.)

T.C. was another woman under the control of the criminal enterprise. T.C. testified that the criminal enterprise would give her money to purchase prepaid credit cards so she could post ads on Backpage and tell her what to post. (Tr. at 1039-40.)

T.C. testified that after a date she would give all of the money to the criminal enterprise, including "Black." (Tr. at 1045.) "I know I've made over $1,000 easily and I had - - had nothing to show for it." (Tr. at 1047.) When asked how many dates she did in a day, T.C. testified "I mean, it never stopped. You have to kind of under- -- it wasn't like the beginning of a day and the end of a day. It didn't stop. Like, we didn't sleep. We didn't stop. So it was just always." (Tr. at 1046.) T.C. testified that the women could not sleep, and that Cottrell "would take the room key and smack them in the face with it" if he caught them sleeping. (Tr. at 1064.) The women were not allowed to sleep because they "[g]ot to work." (Tr. at 1065.)

T.C. testified to the relationship between drugs and dates. "I would do dates. I would get money. Sometimes I would wait until I had a couple dates and then I would go to the other room where C.J. was. I would give him my money and I would get my drugs. I would go back to the other room and do more drugs to prepare myself for another date." (Tr. at 1048.) The endless cycle forced the prostitutes to become dependent on drugs and to the criminal enterprise.

T.C. recalled the debt situation as "C.J. math," where "[y]ou always owed money. You never were even. You never even broke even. You always owed money." (Tr. at 1048-49.) T.C. testified that she saw Cottrell strangle a girl because she did not give him all her money.

T.C. recalled that Marshall arrived in the later stages but asserted himself quickly. T.C. testified that she did not feel like she could leave when Marshall

was around and that he carried a gun. T.C. testified that one of Marshall's roles was to "watch the girls." (Tr. at 1056.)

T.C. was also at the hotel the night M.W. ran away. She testified that:

> There were several of us at that America's Best and there were probably five girls and Black and Change, and [T.D.] and [M.W.] were going to do a double, which is two girls and one guy. And so we all went into the bathroom to hide while they did the date and I guess [M.W.] made the whole thing up so she could get away. I was in the bathroom and then I heard Change yelling she'd took off, she'd took off, and he went out after her and got her phone and tried to stop her, but she was - - it was freezing cold outside, but she was able to get away.

(Tr. at 1055.)

Columbus Police Detective, Christopher Boyle, testified that in the fall of 2013 a newly formed Human Trafficking Task Force ("Task Force") was investigating activity at hotels in North Columbus. Detective Boyle recalled that people could post ads for prostitution on Backpage using their phones, and the Task Force began to conduct undercover stings on the women in the ads. Detective Boyle testified that "early on it became clear that there was a small group of individuals who were controlling all - - the majority - - vast majority of the prostitution activities and drug sales in that area that - - you know, it was organized in one way or another." (Mar. 6, 2020 Tr. Vol. V at 1246.) The Task Force was assisted by patrol officers, who would pass along information regarding suspected human trafficking or prostitution in the area. The Task Force also interviewed the johns to corroborate and "help us with more identifications of suspects we already knew." (Tr. at 1272.)

Detective Boyle testified that the Task Force reviewed hotel records and identified a record of a four-day stay at the America's Best Value Inn in North Columbus beginning February 14, 2015, under the name of Jeffery Marshall. (Tr. at 1267.) Other records detailed hotel stays under other members of the criminal enterprise including some of the women. Detective Boyle also referred to the Backpage ads and supporting documentation that ties the activity to the criminal enterprise. He reviewed thousands of Backpage ads, and testified he saw ads from T.C., T.D., and M.W. (Tr. at 1320-23.) Cottrell's home was searched and phones, prepaid credit cards, cash, narcotics, and several firearms were recovered.

As a result of the investigation, members of the criminal enterprise were charged in an 18-count indictment alleging sex trafficking and organized prostitution from 2012 to 2015. Marshall was indicted for one count of engaging in a pattern of corrupt activity, R.C. 2923.32, F1, three counts of trafficking in persons, R.C. 2905.32, F1, three counts of compelling prostitution, R.C. 2907.21, F3, and three counts of promoting prostitution, R.C. 2907.22, F4.

Marshall and his brother were jointly tried, and Marshall was convicted of one count of engaging in a pattern of corrupt activity, three counts of

trafficking in persons, one count of compelling prostitution, and three counts of promoting prostitution. He was sentenced to a mandatory ten-year sentence on each count of trafficking in persons, to be served consecutively, five years for engaging in a pattern of corrupt activity and one year each for promoting and compelling prostitution, to be served concurrently with each other and to the ten-year terms, for a total of 30-years.

(Footnotes omitted.) *Marshall I* at ¶ 2-32.

**{¶ 3}**   In *Marshall I*, the appellant asserted five assignments of error. *Id*. at ¶ 34. Relevant to the instant appeal, we sustained Marshall's fifth assignment of error, which the state conceded, as the trial court failed to merge the convictions for trafficking in persons, promoting prostitution, and compelling prostitution. *Id*. at ¶ 68. This matter was remanded with instructions to resentence in accordance with R.C. 2905.32(D). *Id*. at ¶ 72.

**{¶ 4}**   A second sentencing hearing was conducted on August 16, 2023. The trial court found that Counts 6 and 8 merge with each other, Counts 13 and 15 merge with each other, and Counts 16, 17, and 18 merge for the purposes of sentencing. The trial court imposed a mandatory sentence of 5 years for Count 1, a mandatory sentence of 10 years for Count 10, a mandatory sentence of 10 years for Count 13, and a mandatory sentence of 10 years for Count 16. The trial court held that Count 1 would run concurrently with Counts 6, 13, and 16. Counts 6, 13, and 16 would run consecutively to each other for an aggregate sentence of 30 years in prison.

**{¶ 5}**   Marshall filed a timely appeal.

## II.  ASSIGNMENT OF ERROR

**{¶ 6}**   Marshall assigns the following as trial court error:

> The 30[-]year mandatory period of incarceration was contrary to law given the facts of this case.

## III. STANDARD OF REVIEW AND LEGAL ANALYSIS

### A.  Marshall's Sole Assignment of Error

**{¶ 7}**   In Marshall's sole assignment of error, he contends that the consecutive sentence finding that resulted in a 30-year period of incarceration was disproportionate to the seriousness of his conduct and to the danger he poses to the public.

**{¶ 8}**   Under Ohio law, there is a general presumption that a defendant's multiple prison sentences will be served concurrently. *State v. Jones*, 175 Ohio St.3d 374, 2024-Ohio-1083, ¶ 11, citing R.C. 2929.41(A). One exception to this presumption is when the

trial court makes findings supporting the imposition of consecutive sentences under R.C. 2929.14(C)(4), which directs:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 9}** The Supreme Court of Ohio has found that while the trial court " 'is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, * * * it has no obligation to state reasons to support its findings.' " *Jones* at ¶ 11, quoting *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 37. "Nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.* Thus, as long as the appellate court can discern that the trial court engaged in the correct statutory analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld. *Bonnell* at ¶ 29.

**{¶ 10}** When reviewing the imposition of consecutive sentences, R.C. 2953.08(G) instructs appellate courts as follows:

> (2) The court hearing an appeal under [R.C. 2953.08(A), (B), or (C)] shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's

standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under [R.C. 2929.14(C)(4)];

(b) That the sentence is otherwise contrary to law.

{¶ 11} The reviewing court must consider the entire trial court record, which includes oral or written remarks made to or by the trial court at the sentencing hearing. R.C. 2953.08(F). The appellate court must also consider any presentence, psychiatric, or other investigative reports that are submitted to the trial court in writing prior to the imposition of the sentence. R.C. 2953.08(F)(1) through (4). The Supreme Court has set out the test as follows:

> The standard to be applied is the standard set forth in the statute: an appellate court has the authority to increase, reduce, otherwise modify, or vacate a sentence only after it has reviewed the entire trial-court record and "clearly and convincingly f[ound] either * * * [t]hat the record does not support the sentencing court's findings under [certain statutes]" or "[t]hat the sentence is otherwise contrary to law," R.C. 2953.08(G)(2).

*Jones* at ¶ 13.

{¶ 12} Ohio courts have recognized two ways for an appellant to challenge consecutive sentences. First, the appellant can contend that the sentences are contrary to law as the trial court failed to make the findings required under R.C. 2929.14(C)(4). *State v. Rafferty*, 8th Dist. No. 113602, 2024-Ohio-4906, ¶ 26, citing R.C. 2953.08(G)(2)(b). Second, the appellant may argue that the record clearly and convincingly does not support the trial court's findings made pursuant to R.C. 2929.14(C)(4). *Id.*, citing R.C. 2953.08(G)(2)(a). The "clear and convincing" standard is met when it "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 13} Marshall does not challenge that the trial court failed to make the necessary findings to impose a consecutive prison sentence. However, Marshall contends that the sentence was disproportionate to the offense. (Appellant's Brief at 10-11.) Marshall argues his involvement in the offenses was minimal compared to his brother, co-defendant, Cottrell. While Marshall acknowledges that this matter concerns serious offenses and that the convictions require mandatory sentences, he argued the trial court's decision to run the

offenses consecutively "shock the conscience of community standards and sense of justice." (Appellant's Brief at 12.)

{¶ 14} In the case sub judice, the trial court made the following R.C. 2929.14(C)(4) findings at the sentencing hearing:

> I was not present for the trial; however, based on the presentence investigation, it appears that Mr. Marshall was part of the security team with regards to the trafficking victims and he would comply -- ensure they complied with the forced sexual acts. And if they did not comply, he was to become physically violent to gain compliance.
>
> Mr. Marshall also has a violent record and is known -- a member of a -- in prison is -- was committing some rule infractions as well, and this is part of an organized crime.
>
> Based on all of that, I will rule that this will be -- that Counts 6, 13, and 16 will be consecutive to each other and Count 1 will be concurrent to Counts 6, 13, and 16 for an aggregate total of 30 years in prison.
>
> I impose the consecutive sentence because I believe it is necessary to punish the offender and protect the public from future crime and it is not disproportionate to the seriousness of the conduct and danger imposed by the defendant based on the fact of his criminal history and that it was a pattern of criminal enterprise.

(Aug. 16, 2023 Tr. at 16-17.)

{¶ 15} In addition to the statements at the sentencing hearing, the trial court provided in the entry:

> Pursuant to R.C. 2929.14, the Court finds that consecutive sentences are necessary to protect the public from future crime by Defendant. Consecutive sentences are not disproportionate to the seriousness of Defendant's conduct and to the danger Defendant poses to the public. The Court further finds that Defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by Defendant.

(Sept. 6, 2023 Jgmt. Entry at 2.)

{¶ 16} Upon review, we find that the record does, in fact, support the trial court's findings. As noted by the trial court, Marshall was part of the security team for the trafficking of the victims and ensured they complied with forced sexual acts. (Aug. 16, 2023 Tr. at 16-17.) T.C. testified that Marshall arrived in the later stages but "asserted himself quickly." *Marshall I* at ¶ 27. T.C. stated that one of Marshall's roles was to " 'watch the girls,' " and "he carried a gun." *Id.*, quoting March 5, 2020 Tr. Vol. IV at 1056. According to testimony at trial, Marshall " 'flew off the handle very easily and he [was] very intimidating,' " and he made the other victims watch as he assaulted T.D. *Id.* at ¶ 15,

quoting March 4, 2020 Tr. Vol. III at 634. M.W. noted Marshall's importance to the criminal enterprise when she testified that Cottrell "would only leave the premises if Marshall was around." *Id.* at ¶ 16. According to co-defendant Michelle Martin, Marshall was viewed as a leader, and "Marshall would babysit the women, take their money, and could be intimidating '[i]f he had to.' " *Id.* at ¶ 22, quoting March 5, 2020 Tr. Vol. IV at 1012. Michelle testified that Marshall would " 'take over for C.J. so C.J. could go off and do whatever he wanted.' " *Id.*, quoting March 5, 2020 Tr. Vol. IV at 879.

{¶ 17} As we explained in *Marshall I*, the record provides several examples of how Marshall's conduct facilitated the human trafficking and prostitution activities. *Id.* at ¶ 52. "Drugs, sleep deprivation, financial extortion, intimidation, and violence were all used to force the women to prostitute. The women were forced to live and work in crowded hotel rooms." *Id.* Any non-compliance by the victims resulted in violence. *Id.* "Even if Marshall's participation was, as he suggests, minimal and of a short duration, he nonetheless played a key role in the criminal enterprise." *Id.* at ¶ 53. The record also indicates that Marshall has a criminal history that includes both violent and firearm-related convictions, and that his prior sentences were not effective in modifying his conduct. Even at the August 16, 2023 sentencing hearing, Marshall did not show remorse for the offenses as he claimed he was wrongfully convicted. Marshall asked to take a polygraph test to demonstrate his innocence, and he also asked that the prior witnesses in the case take polygraph tests regarding their testimony at trial. (Aug. 16, 2023 Tr. at 9-10; Def.'s Ex. A.)

{¶ 18} For the foregoing reasons, we cannot say that the trial court erred in its imposition of consecutive prison sentences. Accordingly, Marshall's sole assignment of error is overruled.

## IV. CONCLUSION

{¶ 19} Having overruled Marshall's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and EDELSTEIN, JJ., concur.